Filed 2/10/22; Certified for Partial Pub. 3/10/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re D.P. et al., Persons Coming Under the Juvenile Court Law. | C093132 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>K.P.,<br><br>Defendant and Appellant. | (Super. Ct. No. STKJVDP20190000412) |
| In re D.P. et al., Persons Coming Under the Juvenile Court Law. | C093535 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>D.P. et al.,<br><br>Defendants and Appellants. | (Super. Ct. No. STKJVDP20190000412) |

1

K.P. (mother) and D.P. (father), parents of the minors (parents), appeal from the juvenile court's orders denying mother's petitions to change the court's order terminating her reunification services and thereafter terminating both of their parental rights, freeing the minors for adoption. (Welf. & Inst. Code, §§ 366.26, 388, 395.)[1] We will affirm the juvenile court's order denying mother's section 388 petitions but reverse its orders terminating parents' parental rights.

## I. BACKGROUND

*Detention*

On October 17, 2019, the San Joaquin County Human Services Agency (Agency) filed a petition naming five of the parents' children: Kr. (16 years old), Da. (15 years old), Ka. (14 years old), Dy. (three years old), and Ki. (two years old).[2] The petitions alleged the minors came under the jurisdiction of the juvenile court through section 300, subdivisions (a), (b)(1), (c), and (j). The petitions' factual bases included a description of an argument and abuse between father and Ka. on October 13, 2019, the parents' past abuse of the minors, the parents' history of drug abuse, three of the children having been born with drugs in their system (Da., Dy., and Ki.), the parents' history with the Agency, and the parents' criminal history.

The October 17, 2019 detention and jurisdiction report detailed the incident leading to the Agency's contact. On October 13, 2019, father got into an argument with Ka., repeatedly hit her with a piece of wood, and choked her. Ka. sent photos of bruising on her back, shoulders, neck, and arm to her aunt, telling her, " 'He almost killed me and that's the only reason he stopped.' " This bruising was later observed by a doctor at a

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

[2] This appeal concerns only the two younger minors, Dy. and Ki.

hospital, and the bruise around her neck "appeared to be evidence of something chocking [*sic*] the minor."

Mother told the social worker she saw the incident and admitted to also hitting Ka. during the argument. She said father had a history of aggressive discipline that would leave marks on the minors, but she said he never hurt Dy. or Ki. She also admitted she and father would use methamphetamine around the children and money was diverted from the family for drugs.

The report also detailed seven previous child welfare referrals involving the parents, including when three of the minors, including the youngest two who are the subjects of this appeal, tested positive for amphetamines and barbiturates when they were born, continued failure of the minors to attend school, and arguments that turned physical between the parents and minors.

At the October 18, 2019 detention hearing, the juvenile court found a prima facie case had been made, ordered the minors detained, and ordered the parents assessed for drug court. In two separate hearings, on December 10, 2019, and January 15, 2020, the parents did not contest the petition and the court found true the allegations in the petition.

*Disposition*

The February 14, 2020 disposition report recommended the parents be bypassed for services under section 361.5, subdivisions (b)(6) and (b)(13), due to the physical abuse of the minors and the parents' extensive drug abuse. The social worker had interviewed the teenage minors who said father would make them steal; Da. once threatened to jump off the roof in frustration and father encouraged him to; once during a fight mother tried to stab father and father shot at mother, almost hitting Kr.; and that the parents "frequently used the girls to make drug transactions." They said the parents' behavior did not change even when they were sober. The report also noted all the siblings have a "close bond" and visit together once a week. The report found the older

3

three minors were not adoptable due to their age, but Dy. and Ki. were suitable for adoption if the parents failed to reunify.

The disposition report concluded: "The totality of issues in this case are insurmountable, and this worker does not feel that the Agency should fund the parent's [*sic*] attempts to reunify with their children. This worker feels the burden should fall on the parents. They need to prove to the Court that they are willing to commit to making their family whole and healthy. The parents have a pattern of being clean for short periods of time, and this behavior has become habitual. This worker is recommending that the parents not be offered reunification services, as it does not appear likely that the parents will make the changes necessary to provide a safe, stable and drug free home for any of their children."

In a supplemental report, the social worker detailed conversations with father and mother in March and April 2020. Father admitted to his drug use, teaching the children to steal, and physically abusing Ka. Mother also admitted to drug use, saying they "would use heavily, stop, and go back to using heavily again." She also described father's past abuse of the minors, mostly of Da.

The dispositional hearing was held on June 23, 2020. The court noted it was "impressed by [the parents'] efforts in the drug court." But it found the children must be removed and bypassed the parents for reunification services under section 361.5, subdivisions (b)(6) and (b)(13) based on the findings in the disposition report. The court also scheduled a section 366.26 hearing for Dy. and Ki.

**Section 388 Petitions**

In September 2020, father and mother filed petitions under section 388 to change the court's order denying them reunification services. Father filed one petition for all five children alleging he completed an inpatient program in May, expected to graduate drug court in October, had taken anger management and parenting classes, and had finished therapy; he included certificates from these programs. Father asserted the

4

"children are bonded with the parents and wish to return home. Father has gone above and beyond to better himself for the sake of the children."

Mother filed identical petitions for all five children, alleging she had been sober for 11 months and had completed a number of classes and programs throughout the year: an inpatient program and anger management classes in April 2020, parenting classes in January, attended therapy from February to May, and was also expected to complete drug court in October.[3] She attached certificates of completion and letters from program administrators attesting to her attendance and completion of the programs. She also included the records from drug court, showing she started the program in October 2019 and made it to two more appearances after the dispositional hearing. Mother's petitions also noted she had been employed since August 2020.

Mother further alleged restarting services would be better for the minors, stating "[t]he children love me and are bonded to me. They want to reunite with me. I have had had [*sic*] extensive services that have helped me heal in many areas and I am a totally different person then [*sic*] one year ago. I can now be a protective and a great parent now."

On November 10, 2020, the court summarily denied the parents' section 388 petitions by written orders, finding for each: "[T]he request does not state new evidence or a change of circumstance" and "the proposed change of order . . . does not promote the best interest of the child."

Mother timely appealed the denial of her section 388 petitions.

### *Section 366.26 Hearing*

The September 25, 2020 section 366.26 report recommended parental rights be terminated as to Dy. and Ki., "[c]onsidering parents [*sic*] long history of neglect and

---

[3] Mother later testified her graduation from drug court was delayed until January 2021 because of the COVID-19 pandemic.

abuse." The social worker described the family as a "classic dysfunctional family" due to constant moving, neglect, and "extreme physical and emotional abuse. . . . It was not surprising that, after their last removal, the three teenage children adamantly refused to return home and preferred living in group-homes instead. They also refused to have visitations or any other type of contact with the parents."

The report also noted the history of contact with child welfare, and though the parents received services, "they failed to show any long-term effects of the services and soon reverted to their old lifestyle." The parents also had a history of getting clean from drugs "but have always relapsed." The older children had experienced trauma from their parents' abuses, and "[i]t is obvious that, if returned to their parents, the minors would definitely suffer the way their older siblings did and would develop similar emotional and behavioral issues as they grow up."

The report emphasized that "[Dy.] and [Ki.] deserve a home that will give them what they need to succeed in life." It indicated there is a good likelihood the younger minors will be adopted and are "bonded with their care providers who are also their relatives and have remained adamant about adopting the minors since their placement." The minors were "happy and prospering in their new placement and have exhibited the desire to stay with their prospective adoptive parents." The report also noted the "parents visit the minors on a regular basis," which is "once a week," along with their other siblings.

On February 2, 2021, the juvenile court held the section 366.26 hearing. The Agency submitted the section 366.26 report as its evidence and did not call any witnesses. Mother testified on her own behalf. Mother said she was very close with Dy. and Ki.; they were always with her, "[w]e wake up together. We do everything together." She said during the course of the case, she made every visit, seeing them twice a week until visits were cut to once a week due to the COVID-19 pandemic. She asked for more visits but was refused because her services were terminated.

6

When asked how the kids treat her, she responded they are "very loving." Dy. would ask her if he was "going to come home yet" and Ki. would tell her "at the end of the visit she doesn't want to go back." She testified they also call her "mom" and "run to me, but [the caretaker] tells them to stand by them so they listen to her, but as soon as we get into the visit, they run, like, 'Mommy, I love you. I miss you.' "

Mother was asked whether she thought if "[her] parental rights [were] terminated that it [would] be emotionally distressing" to Dy. and Ki. She responded: "Yes, I do think so. [Ki.] is a very strong little girl and I notice that when she's with [her caretaker], she doesn't talk as much, but when she's with us, she talks the whole visit. Like, she's always talking. She's more—she's more happy. [¶] When she knows it's time to go, like when we have to get the toys put away, she says, 'No, mom, I don't want to. I don't want to go.' I told her, 'I'm sorry. I'm trying my best.' " When Dy. was told mother got a new place to live, he said, " 'So I get to go home with you today?' " She felt they were both "still strongly bonded" with her.

Through cross-examination from father's attorney, mother said she and father visited together and said she asked for more visits "[a]ll the time." She also said the minors cried when visits were over, especially Ki. The minors' counsel only asked mother the ages of the minors when they were removed and when her visits were reduced to once a week. Agency counsel did not cross-examine mother.

Father's counsel then told the court she intended to call father, but "his testimony will basically mimic the mothers. So for judicial economy, I don't think we need to call the father."

In closing arguments, Agency counsel argued the minors see their caregiver, and prospective adoptive parents, "as the parental figure," they are "bonded to their caretaker, and they are a relative. It's not like the parents aren't going to be in the minors' life, and it's not like the siblings aren't going to be in their lives, either." He also noted the parents "were bypassed due to a previous history and not showing they had made an

7

effort to rectify that history." Thus, the Agency was recommending and requesting termination of parental rights because "it's in the minors' best interest and we don't believe any exception has been shown today." The minors' counsel agreed, arguing the parents have not met their burden and "the children have bonded well with the foster parents, their relative foster parents."

Mother's counsel argued that the only testimony provided established "these children are still very much bonded to the mother and the -- I assume to the father," pointing out "[t]hey're crying, not wanting to leave" and "there's nothing in this report that says otherwise. That it would be emotionally harmful for her daughter and her son to be separated from her." Father's counsel agreed and noted the parents have been visiting as much as they could. Both parents' counsel also pointed out that the court must assume that if parental rights are terminated, "they're not going to have any visits anymore with the mom or the dad."

The court terminated parental rights, finding: "When we get to this stage, the burden shifts from the agency to the parents and to show the applicability of one of the exceptions. I really don't have enough evidence to that fact. The parents have the burden. So the Court must proceed with the termination."

The parents timely appealed termination of their parental rights.

## II. DISCUSSION

### A.    *Section 388 Petitions*

Mother first argues that the court abused its discretion when it summarily denied her section 388 petitions to reinstate reunification services as to Ki. and Dy.[4] She asserts that she at least established a prima facie case to justify an evidentiary hearing. We disagree.

---

[4] Father does not challenge the denial of his section 388 petition and also did not appeal this issue.

*1.      Legal Standards*

A petition to change or modify a juvenile court order under section 388 must factually allege that there are (1) changed circumstances or new evidence to justify the requested order, and (2) that the requested order would serve the minors' best interests. (*In re Daijah T.* (2000) 83 Cal.App.4th 666, 672 (*Daijah T.*); *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 526.)  The petitioner has the burden of proof on both points by a preponderance of the evidence.  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 48, disapproved of on other grounds by *In re Caden C.* (2021) 11 Cal.5th 614, 636, fn. 5 (*Caden C.*).)

The child's best interests "are not to further delay permanency and stability in favor of rewarding" the parent for his or her "hard work and efforts to reunify." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)  " 'A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent . . . might be able to reunify at some future point, does not promote stability for the child or the child's best interests.' " (*In re Mary G.* (2007) 151 Cal.App.4th 184, 206; accord, *In re Casey D., supra,* 70 Cal.App.4th at p. 47.)  "The change in circumstances supporting a section 388 petition must be material." (*In re N.F.* (2021) 68 Cal.App.5th 112, 120.)

The petition must be liberally construed in favor of its sufficiency.  (Cal. Rules of Court, rule 5.570(a).)  Nonetheless, if the juvenile court finds that even so construed the petition fails to make a prima facie case as to either or both tests under section 388, the court may deny the petition without an evidentiary hearing.  (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189; *In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1414; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 806; see Cal. Rules of Court, rule 5.570(d).) A prima facie showing is not made "unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*In re J.P.* (2014) 229 Cal.App.4th 108, 127.)  "In determining whether a parent has made

a prima facie showing under section 388, we may consider the entire factual and procedural history of the case." (*In re Daniel F.* (2021) 64 Cal.App.5th 701, 711.)

We review the denial of a section 388 petition for abuse of discretion. (*In re S.R.* (2009) 173 Cal.App.4th 864, 870; *In re J.T.* (2014) 228 Cal.App.4th 953, 965.)

### 2. *Analysis*

For the first element, change in circumstances or new evidence, mother mostly offered evidence that was already available to the court at the time of bypass. The juvenile court bypassed mother for services on June 23, 2020, at the dispositional hearing. Most of the classes and programs mother completed as support for her petition occurred before this, from January to March 2020. Thus, these circumstances, even if proven at a later evidentiary hearing, could not establish a subsequent change in circumstances because they were the present circumstances at the time of the court's order.

What new evidence mother did present could also not exhibit a material change in circumstance. This was: (1) she got a job in August, (2) she was going to finish drug court in October, and (3) she had remained sober. Initially, there is no indication mother's lack of employment played a significant role in this case. Though commendable and a positive change overall, whether mother was later employed was not a change in the circumstances underlying the basis for her being bypassed for services.

As for the latter two, the court noted before it bypassed mother for services that it was already "impressed" by her efforts in drug court. At that point, she had been attending regularly for eight months. That she successfully attended drug court twice more and planned to graduate four months later is not a material change from the circumstances presented to the court at the dispositional hearing.

This is the same with mother's continued sobriety. Though again quite commendable, and assuredly hard earned, we must consider the entire history of the case. This includes mother's past encounters with child welfare and her continued struggles

10

with sobriety. As described in the dispositional report relied on by the court to bypass services, "[t]he parents have a pattern of being clean for short periods of time." Mother even admitted to the social worker they "would use heavily, stop, and go back to using heavily again." This is supported in part by Da., Dy., and Ki. testing positive for drugs at birth. Dy. was born 12 years after Da., and Ki. was born 16 months after Dy.

Several more months of sobriety by itself is therefore not a material change in circumstances here given mother's long history of substance abuse that has included unsuccessful periods of intermittent sobriety. The necessary change of circumstance would be a lengthy period of sobriety demonstrating lasting sobriety. How long mother needed to remain sober to achieve this change in circumstances is not for us to decide. The court denied mother's petition after she had remained sober for an additional five months, 13 months in total, necessarily finding this would not constitute a sufficient change in circumstances even if it were proven at a full hearing. We conclude the court's implied finding on this point was not an abuse of discretion.

Mother's petition also failed to allege how a change in the court's order would be in the best interests of Dy. and Ki. "If the petition presents any evidence that a hearing would promote the best interests of the child, the court will order the hearing." (*Daijah T., supra*, 83 Cal.App.4th at p. 673.) To determine the minor's best interests, a court examines: "(1) [T]he seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F., supra*, 56 Cal.App.4th at p. 532.)

Mother's petitions made only a broad assertion that the "children love me and are bonded to me. They want to reunite with me." But this fails to address the serious issues that led to their removal, mainly the abuse of the older children and her substance abuse. For the reasons discussed above, mother's substance abuse was changing, not changed.

11

As for amelioration of her proclivity towards domestic violence and permitting domestic violence, mother presented only evidence of completing classes and attending therapy sessions. But these classes and sessions were completed before the dispositional hearing and any change in circumstance is similarly weighed against her long history of allowing father to abuse the children.

Mother also makes no mention of the bonds with the minors' caretakers. This was well documented in the September 2020 section 366.26 report, filed before the court denied mother's section 388 petition. Though the minors may be bonded with mother (discussed more below), the evidence available to the court when it denied mother's petition indicated a significant bond with the caretakers. Mother's petition does not allude to any evidence she could provide that addresses her bond with the children relative to their bond with the caretakers.

Finally, mother's problems are significant and not easily ameliorated, as previously discussed. And mother's long history of substance abuse directly impacted the minors' well-being: Both Dy. and Ki. were born testing positive for drugs, mother used drugs in their presence, mother diverted family resources to purchase drugs, and mother would use the older children to purchase drugs. She does not allege any evidence countering this history other than what we have already found to be insufficient. Mother's petition therefore did not establish a prima facie case that services, or eventual return of the minors, would benefit the minors.

Under these circumstances, mother's petitions did not establish a prima facie case requiring that the court set the matter for an evidentiary hearing. We conclude the juvenile court did not abuse its discretion in denying mother's section 388 petitions without a hearing.

B.    *Beneficial Parental Relationship Exception*

Both parents contend the juvenile court erred in terminating their parental rights as to Dy. and Ki. because they established the beneficial parental relationship exception.

12

They assert they regularly visited the minors, have a parental relationship with the minors, and are bonded with the minors such that cessation of parental rights would be detrimental to the minors.

The Agency argues that the beneficial parental relationship exception does not apply. It does not dispute the parents maintained regular visits with Dy. and Ki. and that they appeared to enjoy their interactions with the parents. But the Agency contends there is no evidence continued contact with the parents would be beneficial to the minors, especially because the "minors were bonded to their caregivers and looked to them to provide for [their] physical and emotional well-being." We conclude the juvenile court's order must be reversed in light of *Caden C.*, *supra,* 11 Cal.5th 614.

    1.    *Legal Standards and* Caden C.

The express purpose of a section 366.26 hearing is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) If the court finds by clear and convincing evidence the child is likely to be adopted, and there has been a previous determination that reunification services be terminated, "then the court shall terminate parental rights to allow for adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 630.) The court should decline terminating parental rights only if the parents can establish termination would be detrimental to the child under one of the statutory exceptions—" '[t]he statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption." (*Id*. at p. 631.) "In other words, when a parent establishes that one of the exceptions applies, adoption or termination is not 'in the best interest of the child.' " (*Ibid*.)

The beneficial parental relationship exception applies when: "The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i)). There are three discrete elements a

13

parent must show by the preponderance of the evidence:  " (1) [R]egular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child."  (*Caden C., supra*, 11 Cal.5th at pp. 631; see *id*. at pp. 636-637.)

Our Supreme Court recently analyzed this exception in depth in *Caden C*., published after the juvenile court's section 366.26 ruling here.  The Supreme Court found the first element "straightforward," just if " 'parents visit consistently,' taking into account 'the extent permitted by court orders.' "  (*Caden C., supra*, 11 Cal.5th at p. 632.) The second element is, as with the entire analysis, focused on the child, and may be shaped by factors such as:  " '[T]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents."  (*Id*. at p. 633.) "[O]ften expert psychologists who have observed the child and parent and can synthesize others' observations will be an important source of information about the psychological importance of the relationship for the child."  (*Id*. at pp. 632-633.)  Finally, for the third element, "the court must decide whether it would be harmful to the child to sever the relationship and choose adoption.  [Citations.]  Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship."  (*Id*. at p. 633.) Thus, courts in effect consider "what life would be like for the child in an adoptive home without the parent in the child's life."  (*Ibid*.)

*Caden C.* clarified that, when deciding whether termination of parental rights would be detrimental to the child, the court is not comparing the parent's and custodial caregiver's attributes.  (*Caden C., supra*, 11 Cal.5th at p. 634.)  "Nothing that happens at the section 366.26 hearing allows the child to return to live with the parent.  [Citation.] Accordingly, courts should not look to whether the parent can provide a home for the

14

child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Ibid.*)  Thus, a parent's lack of progress in addressing the issues that led to dependency is not determinative, otherwise the exception would never apply.  A section 366.26 hearing is held when a parent has not been successful in addressing the problems leading to dependency, the "exception can therefore only apply when the parent has presumptively *not* made sufficient progress in addressing the problems that led to dependency." (*Caden C., supra,* at p. 637.)  Inability to address the issues leading to dependency can be relevant in assessing whether the interaction between parent and child "has a 'negative effect' on the child." (*Ibid.*)  But it is only relevant to the extent it informs the central question before the court:  "[W]ould the child benefit from continuing the relationship and be harmed, on balance, by losing it?" (*Id.* at p. 638.)

Performing this analysis is a "subtle enterprise" that can "be a daunting prospect for trial courts." (*Caden C., supra*, 11 Cal.5th at pp. 634, 635.)  Sometimes, "a relationship involves tangled benefits and burdens.  In those cases, the court faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Id.* at p. 634.)  To aid in this analysis, the Supreme Court suggested "trial courts should seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony" in helping to determine the importance of the parental relationship for the child. (*Id.* at p. 633, fn. 4.)

The Supreme Court also determined the applicable standard of review for the beneficial parental exception:  "[A] substantial evidence standard of review applies to the first two elements" and the third element, given it is a hybrid of factual determinations and discretionary balancing, is "properly reviewed for abuse of discretion." (*Caden C., supra*, 11 Cal.5th at pp. 639, 640.)  "But where, as with the parental-benefit exception, 'the appellate court will be evaluating the *factual basis* for an exercise of discretion, there

likely will be no practical difference in application of the two standards.' " (*Id*. at p. 641.)

   *2. Subsequent Cases*

  We requested supplemental briefing on two cases that applied *Caden C.* after briefing concluded in this case: *In re J.D.* (2021) 70 Cal.App.5th 833 (*J.D.*) and *In re D.M.* (2021) 71 Cal.App.5th 261 (*D.M.*). In *J.D.*, the juvenile court terminated parental rights after making "few explicit factual findings concerning the parental benefit exception." (*J.D., supra,* at p. 851.) The appellate court reversed and remanded because it could not be "certain the juvenile court did not consider factors disapproved of in *Caden C*." (*Id*. at p. 854.) The agency's reports focused on the connection between the caretaker, who was a relative of the mother, and the child, but "such evidence does not preclude a finding he had a significant positive attachment to mother." (*Id*. at p. 859.) Conversely, there was "very little information in its prior reports during the case about the quality of mother's relationship with" the child. (*Id*. at p. 860.) The appellate court found that, though it is not the agency's burden to disprove the beneficial relationship exception, "by the time the juvenile court scheduled the section 366.26 hearing, the agency's prior reports should already have provided objective, disinterested information about the quality of [the child's] attachment to his mother." (*Id*. at p. 861.) The mother had also presented evidence, mainly through visitation logs, that the child had a " 'substantial, positive, emotional attachment' to her sufficient to meet the second element." (*Id*. at p. 855; see *id.* at pp. 856-859.)

  Similarly, in *D.M.*, the juvenile court terminated the father's parental rights after a brief analysis finding the beneficial parental relationship exception did not apply. (*D.M., supra*, 71 Cal.App.5th at p. 268.) The appellate court reversed and remanded because the juvenile court "said nothing about the attachment between father and his children. *Caden C.* made clear the beneficial relationship exception is *not* focused on a parent's ability to care for a child or some narrow view of what a parent-child relationship should

look like." (*Id*. at p. 270.) The agency's reports also "gave the court little evidence about the quality of the visits between father and the children, or how the children felt about father." (*Ibid*.) Whereas the record did include the father's testimony that "the children wanted to be returned to him, and that the youngest child cried when visits concluded." (*Id*. at p. 271.)

In supplemental briefs, father asserts the juvenile court considered improper factors, such that visitation would continue between the minors and parents, and the social worker did not give serious consideration to all possible permanent plans. Mother asserts the Agency's concession that "there will be a continuing relationship between the children and, [at] a minimum, [mother]," is an "admission that the relationship is sufficiently strong" and therefore is a "concession that all three prongs have been met." Mother also argues *J.D.* and *D.M.* cases highlight the deficiencies in the social worker's reports here and the failure to consider guardianship. The Agency asserts in its supplemental brief that *J.D.* and *D.M.* are inapplicable because the social worker's reports here "provided the juvenile court with an adequate assessment of the relationship between the minors and [parents]."

3. *Analysis*

The grounds for reversal are stronger in this case than in *J.D.* and *D.M.* because the juvenile court here performed no specific analysis on the beneficial parental relationship exception, instead finding only that the parents presented inadequate evidence to justify any exception. The juvenile court's ruling does not comport with the requirements established in *Caden C*.

The first element is rightly uncontested. As documented in the social worker's reports and mother's testimony, both parents regularly visited Dy. and Ki. Though the global pandemic required a reduction of visits from twice a week to once a week, we must consider the extent the visits were permitted.

17

There was also evidence supporting the second element, that the children would benefit from continuing the relationship. Mother testified, which was also applied to father, the children lived with her and father for their entire life until they were removed. She said they were very close—waking up together and doing everything together. Mother said the kids also loved her, called her mom, ran to her when they started the visits, routinely asked when they would be coming home with her, and they were happier with her than with the caretakers This testimony is evidence the young minors cared about the parents and felt the parent-child relationship was beneficial.

The available visitation logs, drafted by a social worker and included with the disposition report, tend to support mother's testimony. The logs show that the children did immediately hug the parents or run towards them at the beginning of at least some of the visits. The minors also often called mother "mom" or "mommy," and the parents parented the children during the visits: feeding them, playing with them, and disciplining them. All available visitation logs further indicate there were no concerns noted at the visits.

Finally, for the third element, mother testified that terminating parental rights would be "emotionally distressing" to Dy. and Ki. She explained that Ki. was "more happy" and talkative with her than the caregiver but when visits were over, she said " 'No, mom, I don't want to. I don't want to go.' " The visitation logs also provide evidence to this element, showing the children would sometimes get upset at the end of the visits when they had to leave their parents. Mother also testified to the ultimate issue, stating the children are "strongly bonded to her." Although this evidence is certainly not dispositive in and of itself, it is the only available evidence of bond in the record and it was not found to be not credible by the juvenile court; indeed, the court did not explain its findings at all.

Finding some evidentiary support for each element of the beneficial parental relationship exception, we must reverse the juvenile court's order terminating parental

18

rights. We do not determine whether the parents carried their burden in establishing this exception. We instead find the juvenile court's ruling that there was inadequate evidence to support the exception was an abuse of discretion under *Caden C.* Thus, we reverse and remand for the juvenile court to weigh the evidence presented under the applicable standard and, in its discretion, consider additional evidence.

We make additional observations to aid the juvenile court on remand. We first note the court may have considered improper factors and should refrain from doing so on remand. The section 366.26 report's recommendation relied heavily on the parents' past issues leading to dependency and their ability to address them. Specifically, it considered the "parents['] long history of neglect and abuse," "they failed to show any long-term effects of the services and soon reverted to their old lifestyle," and "if returned to their parents, the minors would definitely suffer the way their older siblings did." Agency counsel similarly remarked in closing arguments that the parents "were bypassed due to a previous history and not showing they had made an effort to rectify that history."

As *Caden C.* clarified, these considerations are relevant only as far as they negatively impact the parental relationship with the child. The Supreme Court explained, "return to the parent's custody is not an option at the section 366.26 hearing. [Citation.] Accordingly, whether the parent is or is not 'ready for the children's return to her custody' is not, by itself, relevant to the application of the parental-benefit exception." (*Caden C., supra*, 11 Cal.5th at p. 638.) To help the juvenile court, the report should have explained how, if at all, the parents' struggles would affect their relationship with the children.

Next, there are also indications the juvenile court's decision relied on the children's bond with the caregivers without assessment of their relative bond with the parents. The section 366.26 report stated the children are "bonded with their care providers" and "are happy and prospering in their new placement and have exhibited the desire to stay with their prospective adoptive parents." Agency's counsel again echoed

19

the report, stating in closing arguments "the children have bonded well with the foster parents." And it makes similar assertions in its briefs in this appeal. But a child can have attachment with both their caregiver and their parents, thus it is not necessary that the child be primarily bonded with the parent for the exception to apply. (*J.D., supra*, 70 Cal.App.5th at p. 859 ["In proving the existence of a beneficial relationship, mother was not required to prove that [the child's] attachment to her was his primary bond. [Citation.] A child's emotional attachments are not a zero-sum game"].) Mother's testimony and the visitation logs provide at least some evidence the parents were bonded with the children such that severing parental rights would be detrimental to the children. On remand, the juvenile court should consider evidence of this bond and whether "the child has a substantial, positive, emotional attachment to the parent" such that "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.)

Relatedly, the court may have also considered the possibility the parents would have a continued relationship with the minors, given the prospective adoptive parents are relatives. The Agency argued in closing that "[i]t's not like the parents aren't going to be in the minors' life." Counsel for both parents pushed back on this proposition at the hearing, but mother on appeal stresses in all her briefs that termination is inappropriate here because the minors' adoption is only a "rearrangement" of the family, so there is a "high probability and strong likelihood that the relationship between the children and their parents is going to continue." Considering a potential future relationship between the parents and the minors, for any reason, is impermissible at a section 366.26 hearing. (*Caden C., supra*, 11 Cal.5th at p. 633 ["courts must assume that terminating parental rights terminates the relationship"].)

We cannot fully assess the prevalence or impact these improper considerations may have had on the juvenile court's ruling because it did not analyze the exception

beyond finding inadequate evidence. (See *J.D., supra*, 70 Cal.App.5th at p. 854 ["[W]e conclude that the juvenile court's ruling cannot be affirmed on this record, because we cannot be certain the juvenile court did not consider factors disapproved of in Caden C."].) But on remand, the juvenile court should ensure these factors are not improperly considered.

We recognize the juvenile court did not have the benefit of *Caden C.* when making its ruling, which further justifies remand. (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1228 ["In determining whether the parents met their burden of proof on the second element, the juvenile court did not have the benefit of the guidance provided in [*Caden C.*]"]; *J.D., supra*, 70 Cal.App.5th at p. 863 ["because neither the parties nor the court had the benefit of *Caden C.*, we deem it prudent to remand for a new section 366.26 hearing"]; *D.M., supra*, 71 Cal.App.5th at p. 271 ["We cannot know how the court would have exercised its discretion if it had the benefit of the *Caden C.* analysis when making its ruling. We believe the juvenile court should make this determination in the first instance"].)[5] *Caden C.* emphasized the complexity of this analysis and provided helpful guideposts to juvenile courts in making these thorny considerations. Our Supreme Court also recommended trial courts "seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony." (*Caden C., supra*, 11 Cal.5th at p. 633, fn. 4; *J.D., supra*, 70 Cal.App.5th at p. 855 ["Given the importance

---

[5] In a recent Sixth District case, the appellate court found a pre-*Caden C.* order terminating parental rights still satisfied *Caden C.* (*In re A.L.* (Jan. 18, 2022, H048761) __ Cal.App.5th __ [2022 Cal.App. LEXIS 33].) That case has significant factual dissimilarities from the present case, including that the juvenile court there did not consider improper factors like the juvenile court did in the present case. (*Id.* at [p. 44] ["The record here does not show that the juvenile court based its decision that the exception did not apply, in whole or in part, upon the finding that father was not ready to have the minor returned to his custody"].) The appellate court also distinguished *J.D.* and *D.M.*, two cases relied on for their similarity here. (*Id.* at [pp. 48-50 & fn. 14].)

21

of this second stage of analysis, 'social worker assessments and evaluations should address whether or not the children have a substantial, positive, emotional attachment to the parents' "].)

C.    *Conflict of Interest*

Finally, father also argues the minors' counsel had a conflict of interest because he represented all five children.  Father asserts "[Ki.] and [Dy.] had substantially different relationships with their parents and a heightened interest in continuing those relationship[s] than did their older siblings, who refused to even visit them."  We disagree.

Courts generally appoint one attorney for all siblings in dependency proceedings. (*In re T.C.* (2010) 1901 Cal.App.4th 1387, 1390; *In re Celine R.* (2003) 31 Cal.4th 45, 55 [courts "should not automatically appoint separate counsel for separate children"].)  But separate counsel is required when "there is an actual conflict among the siblings or if circumstances specific to the case—not just the potential for conflict that inheres in all multisibling dependency cases—present a reasonable likelihood an actual conflict will arise."  (*In re Celine R., supra*, at p. 58.)  The children's interests must not only be different, but adverse to each other.  (*In re T.C., supra,* at p. 1391.)

The minors here had differing but not conflicting interests.  The older children never sought reunification with the parents due to the long history of physical and emotional abuse; they were also not adoptable given their age.  Dy. and Ki. were found to be adoptable and the social worker found this to be in their best interest.  But father does not explain how these differing interests and permanent plans were in actual conflict with each other.  There is no indication the older children sought to thwart the younger children's adoption, and the older children's permanent plan to not be adopted with the younger children does not automatically create an actual conflict with Dy. and Ki.  (See *In re T.C., supra*, 191 Cal.App.4th at p. 1391 ["the fact that siblings have different permanent plans does not necessarily demonstrate an actual conflict of interest"].)

22

Conversely, being in a sibling group is a basis for finding a child may be difficult to place for adoption. (§ 366.26, subd. (c)(3); *In re Gabriel G.* (2005) 134 Cal.App.4th 1428, 1438 [finding the children being in a sibling group "makes the children difficult to place"].) So, it is possible that the older children wanting to be adopted with the younger children would have actually made it more difficult to find Dy. and Ki. adoptive homes. Regardless, there is no basis to find an actual conflict such that the counsel should not have represented all children. Separate counsel need not be appointed on remand unless an actual conflict arises.

## III. DISPOSITION

The juvenile court's order denying mother's section 388 is affirmed, but the orders terminating parents' parental rights are reversed. The matter is remanded for the juvenile court to conduct a new section 366.26 hearing in conformity with the principles articulated in *In re Caden C.* (2021) 11 Cal.5th 614, the views expressed in this opinion, and taking into consideration the family's current circumstances and any developments in the dependency proceedings that may have arisen during the pendency of the appeal.

/S/

_____

RENNER, J.

We concur:

/S/

_____

DUARTE, Acting P. J.

/S/

_____

KRAUSE, J.

23

CERTIFIED FOR PARTIAL PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re D.P. et al., Persons Coming Under the Juvenile Court Law. | C093132 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY, | (Super. Ct. No. STKJVDP20190000412) |
| Plaintiff and Respondent, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| v. | |
| K.P., | [NO CHANGE IN JUDGMENT] |
| Defendant and Appellant. | |
| In re D.P. et al., Persons Coming Under the Juvenile Court Law. | C093535 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY, | (Super. Ct. No. STKJVDP20190000412) |
| Plaintiff and Respondent, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| v. | |
| D.P. et al., | [NO CHANGE IN JUDGMENT] |
| Defendants and Appellants. | |

1

# EDITORIAL LISTING

APPEAL from a judgment of the Superior Court of San Joaquin County, Jose L. Alva, Judge.  Affirmed in part, reversed in part and remanded for further proceedings.

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant K.P.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant D.P.

J. Mark Myles, County Counsel, Shann S. Kennedy, Deputy County Counsel, for Plaintiff and Respondent.

THE COURT:

The opinion in the above-entitled matter filed February 10, 2022, was not certified for publication in the Official Reports.  For good cause it appears now that the opinion should be published in the Official Reports with the exception of parts A and C of the Discussion section (section II), and it is so ordered.  There is no change in judgment.

/S/

_____

DUARTE, Acting P. J.

/S/

_____

RENNER, J.

/S/

_____

KRAUSE, J.

2